UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:                                                              Chapter 11

PERSONAL COMMUNICATION                         Case No.: 13-74303-AST
DEVICES, LLC *et. al.*                               (Jointly Administered)

                                   Debtors.
---------------------------------------------------------x
DEVICES LIQUIDATION TRUST,

                                   Plaintiff,

           - against -                                         Adv. Pro. No.: 13-8174-AST

PINEBRIDGE VANTAGE PARTNERS, L.P.,
(f/k/a PINEBRIDGE VANTAGE CAPITAL
L.P.), *et al.*,

                                   Defendants.
---------------------------------------------------------x

## DECISION AND ORDER GRANTING MOTION TO DISMISS OF DLJ INVESTMENT PARTNERS III, L.P., DLJ INVESTMENT PARTNERS, L.P., AND IP III PLAN INVESTOR, L.P.

Pending before the Court is the motion (the "Motion") filed by DLJ Investment Partners III, L.P., DLJ Investment Partners, L.P., and IP III Plan Investor, L.P. (collectively, "DLJ") seeking dismissal of several claims filed against them by Plaintiff, Devices Liquidation Trust ("Plaintiff"). For the reasons set forth below, DLJ's Motion is granted, and all of Plaintiff's claims against DLJ addressed by the Motion are dismissed.

## Jurisdiction

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b), and 157(b)(2)(A), (K) and (O), and the Standing Orders of Reference in effect in the Eastern District of New York dated August 28, 1986, as amended on December 5, 2012, and made effective *nunc pro tunc* as of June 23, 2011.

## Background and Procedural History

Personal Communications Devices, LLC ("PCD") was a company that purchased and sold cell phones and other wireless devices, acting as an intermediary between manufacturers and carriers, and provided related services.  Personal Communications Devices Holdings, LLC ("Holdings") was the parent company of PCD.  On August 19, 2013 (the "Petition Date"), PCD and Holdings (collectively, "Debtors") filed voluntary petitions for relief under chapter 11, commencing case nos. 13-74303 and 13-74304; these cases were administratively consolidated.  On the Petition Date, Debtors filed a series of first day motions, including a motion seeking approval of a Debtor-in-possession financing facility, as well as a motion to sell substantially all of their assets under § 363(b) and (f)[1], along with a motion to establish bid procedures for the proposed sale[2].  That same day, Debtors and Quality One Wireless, LLC ("Quality One") executed an Asset Purchase Agreement (as amended the "APA") pursuant to which Quality One agreed to purchase substantially all of Debtors' assets and assume certain defined liabilities.

On August 26, 2013, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors of Debtors' estates (the "Committee").

---

[1] Debtors' Motion for Entry of Orders: (A)(I) Approving Bidding Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of the Debtors Assets; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief. [Case No. 13-74303, dkt item 10]

[2] Ex Parte Motion of the Debtors to Shorten Time with Respect to Hearing on Debtors Motion for Entry of Order Approving Bidding Procedures Relating to Sale of the Debtors Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief. [Case No. 13-74303, dkt item 11]

On September 13, 2013, the Court entered its Final DIP Order[3] and on September 16, 2013, entered an Order approving bid procedures[4].  In the Final DIP Order, Debtors stipulated, among other things, to the enforceability of DLJ's claims and liens (Final DIP Order ¶ D), and that the Final DIP Order would be deemed a proof of claim.  Final DIP Order, ¶ 27.  The Committee was required to bring any Challenge against DLJ (as defined in the Final DIP Order), including any objection to DLJ's claims, by October 24, 2013.  Final DIP Order, ¶ 17(b).

On October 17, 2013, the Court approved Debtors' sale of substantially all of their assets to Quality One.  [Case No.13-74303, dkt item 114]

On October 18, 2013, the Court approved a stipulation extending the Challenge period to October 28, 2013.  [dkt item 216]

On October 24, 2013, the Court issued an Order Authorizing the Committee to Bring Certain Causes of Action on Behalf of the Debtors' Estates.  [Case No. 13-74303, dkt item 218]

On October 28, 2013, the Committee commenced this adversary proceeding by filing a Complaint[5] against DLJ along with PineBridge Vantage Partners, L.P. (f/k/a PineBridge Vantage Capital, L.P.), PineBridge Co-Investment AIV Fund, L.P., Vantage Star Investment Corp., PineBridge Plan Star Investment Corp., PineBridge PEP IV Co-Investment, L.P., and PineBridge

---

[3] Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Liens and Superpriority Claims; and (III) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 (the "Final DIP Order"). [Case No. 13-74303, dkt item 114]

[4] Order (I) Approving Bidding Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections, (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief. [Case No. 13-74303, dkt item 116]

[5] The Court authorized the Committee to file its complaint under seal [dkt item 3] and subsequently approved the parties' agreed protocol for the sealing of future pleadings. [dkt item 33] All of the live pleadings considered by the Court in this ruling have been either unsealed in their entirety or re-filed in redacted forms. [dkt items 61, 63-67, 78]

PEP V Co-Investment, L.P. (collectively, "PineBridge"), and the Insurance Company of the

State of Pennsylvania ("ISOP").  [dkt item 1]  (Collectively, ISOP, PineBridge and DLJ are

referred to as the "Investor Defendants").

On December 20, 2013, PineBridge filed a Motion to Withdraw the Reference of this

adversary proceeding [dkt item 9], in which DLJ subsequently joined.  [dkt item 18]  That

motion remains pending before the District Court under 13-mc-01096-JMA.

On December 23, 2013, PineBridge and DLJ filed motions to dismiss the Complaint.

[dkt items 12, 13, 14, 15]  ISOP filed its motion to dismiss on January 15, 2014.  [dkt items 29,

30]

On January 24, 2014, the Committee filed a First Amended Complaint against the

Investor Defendants.  [dkt item 34]  The First Amended Complaint asserts eight causes of

action[6]; however, Plaintiff asserts only the following claims against DLJ, numbered as

denominated in the First Amended Complaint: the second cause of action, for recharacterization

of DLJ's debt as equity; the fourth cause of action, for setoff; the fifth cause of action, for unjust

enrichment; the sixth cause of action, for breach of contract; the seventh cause of action, for a

declaratory judgment as to whether DLJ has a lien on commercial tort claims; and the eighth

cause of action, disallowance of DLJ's claims (collectively, the "DLJ Claims").

---

[6] The eight causes of action are summarized as follows: recharacterization of the debt claims of each of the Investor Defendants as equity interests; equitable subordination of PineBridge's and ISOP's claims to those held by all other creditors; setoff of proceeds received pursuant to the post-petition sale of substantially all of Debtors' assets against, among other things, certain pre-petition distributions received by the Investor Defendants; damages for unjust enrichment against the Investor Defendants; breach of contract; a declaratory judgment that the Investor Defendants' liens and security interests do not encumber Debtors' commercial tort claims under Delaware law; and the disallowance of any claims asserted by the Investor Defendants against Debtors' estates under § 502(d) of the Bankruptcy Code.

On February 21, 2014, DLJ filed its Motion to dismiss the DLJ Claims, excluding the seventh cause of action concerning commercial tort claims, a memorandum of law in support, and an affirmation in support thereof.  [dkt items 37, 38][7]

On March 21, 2014, Plaintiff filed an omnibus response to DLJ's Motion and the other Investor Defendants' motions to dismiss (the "Response").  [dkt item 44]

On April 4, 2014, DLJ filed a reply and a declaration in support.  [dkt items 46, 47]

On April 29, 2014, the Court confirmed the First Amended Plan of Liquidation proposed by Debtors and the Committee (the "Plan").  [Case No. 13-74303, dkt item 421]  The Devices Liquidation Trust, Plaintiff herein, was created under the Plan, and all causes of action of the Debtors vested in Plaintiff.

On July 25, 2014, the Court entered an agreed Stipulation and Agreed Order substituting The Devices Liquidation Trust as the Plaintiff in this adversary proceeding.  [dkt item 56]

On October 9, 2014, while the DLJ Motion and other parties' motions to dismiss were pending, Plaintiff filed its Motion for Leave to File Second Amended Complaint (the "Motion to Amend").  [dkt items 97, 98, 99, 102]  The proposed Second Amended Complaint did not seek to add any claims against DLJ, but did seek to add claims against PineBridge and ISOP, and to add several former members of the Board of Managers of Holdings (the "Director Defendants") as new defendants[8].

---

[7] Other Investor Defendants filed motions to dismiss certain counts of the First Amended Complaint, which have now been superseded or amended by motions to dismiss all or portions of the Second Amended Complaint.

[8] The Second Amended Complaint asserts the same eight causes of action as the First Amended Complaint and asserts six additional causes of action which can be summarized as follows: breaches of the duty of loyalty by the Director Defendants, who are Jonathan Stearns, Winston Chow, F.T. Chong, Susan Nokes, and George Appling; breaches of the duty of care by the Director Defendants; breach of the duty of care by Susan Nokes; aiding and abetting breaches of fiduciary duty by PineBridge and ISOP; breaches of the implied covenant of good faith and fair dealing by the Director Defendants, PineBridge, and ISOP; and willful misconduct by the Director Defendants, Pinebridge, and ISOP.

By Order entered January 20, 2015, this Court granted Plaintiff's Motion to Amend.  [dkt item 119]

On January 21, 2015, the Court conducted a hearing on the DLJ Motion (the "Hearing"), following which it took the matter on submission.

On February 2, 2015, Plaintiff filed its Second Amended Complaint.  [dkt item 123]  As noted above, the Second Amended Complaint asserts fourteen causes of action; however, Plaintiff asserts only the same DLJ Claims against DLJ.  Accordingly, and without opposition from Plaintiff or DLJ, the Court will construe the Motion as against the Second Amended Complaint.

## Legal Analysis

### *Rule 12(b)(6) dismissal*

DLJ bases their requests for dismissal on Rule 12(b)(6), as incorporated by Bankruptcy Rule 7012.  This Court has addressed on numerous occasions the application of Rule 12(b) and the flexible plausible pleading standard established by the Supreme Court.  *See Moxey v. Pryor (In re Moxey)*, 522 B.R. 428, 437-38 (Bankr. E.D.N.Y. 2014); *In re Ippolito*, Case No. 12-70632, Adv. Pro. No. 12-8403 (AST), 2013 WL 828316, at *3 (Bankr. E.D.N.Y. Mar. 6, 2013) (discussing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (pleading standard for a § 1983 claim) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007) (pleading standard for anti-trust conspiracy claim); *see also In re Int'l Tobacco Partners, Ltd.,* 462 B.R. 378, 385 (Bankr. E.D.N.Y. 2011); *In re Jones*, Case No. 10-77783, Adv Pro. No. 10-9033 (AST), 2011 WL 1549060, at *2-3 (Bankr. E.D.N.Y. Apr. 21, 2011); *In re Coletta*, 391 B.R. 691, 693-94 (Bankr. E.D.N.Y. 2008).

Under the U.S. Supreme Court's *Iqbal/Twombly* analysis, to survive a motion to dismiss, a complaint must contain sufficient factual matter, which, when accepted as true, is adequate to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the relief sought. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted" so as to create liability. *Iqbal*, 556 U.S. at 678. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557 (internal citations omitted).

Neither *Iqbal* nor *Twombly* departed from the standard that, in considering a Rule 12(b)(6) motion, a court is to accept as true all factual allegations in the complaint and draw all inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-56; *see also Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). However, as the Supreme Court stated in *Iqbal*, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, a court need not "accept as true a legal conclusion couched as a factual allegation," and "[d]etermining whether a complaint states a plausible claim for relief will [. . .] be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 678-79 (citing FED. R. CIV. P. 8(a)(2)).

In deciding the Motion to Dismiss, this Court must limit its review to facts and allegations contained in the Second Amended Complaint, documents incorporated into the Second Amended Complaint by reference or attached as exhibits, and matters of which this

Court may take judicial notice. *Blue Tree Hotels, Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *see also, Int'l Tobacco Partners, Ltd.,* 462 B.R. at 385 ("The Court may consider documents that are integral to the complaint in deciding a motion to dismiss").  During the Hearing, both Plaintiff and DLJ agreed that this Court can consider the contractual agreements and other documents made a part of the Second Amended Complaint, the Motion and the Response.  [dkt item 121, Hr. Tr. 20:7-21]  Based on this agreement and the applicable case law, solely for purposes of this Order, this Court has determined the following facts to be uncontroverted and construes them in the light most favorable to Plaintiff; these facts are drawn from the Second Amended Complaint, the uncontested allegations raised in the parties' motion papers, and the documents made a part of the Second Amended Complaint, the Motion and the Response.

### Uncontroverted Facts

In July 2008, PineBridge, ISOP and DLJ were involved with the purchase of Debtors from UTStarcom, Inc. for an aggregate amount in excess of $240,000,000.  The Investor Defendants provided a substantial portion of the financing through both loans and equity investments.  The total funds from all debt and equity investments are summarized as follows:

| Source of Funds | Amount |
|---|---|
| **Equity Investment** | |
| PineBridge Defendants[9] | $34,000,000 |
| DLJ | $5,000,000 |
| Other Investors | $9,500,000 |
| **Total Equity:** | $48,500,000 |
| | |
| **Senior Debt** | |
| Non-Defendants' source | $114,379,073 |
| | |
| **Second Lien Debt**[10] | |
| DLJ | $49,500,000 |
| PineBridge Defendants | $29,700,000 |
| **Total Second Lien Debt** | $79,200,000 |
| | |
| **Total Debt and Equity:** | **$242,079,073** |

These sources of cash were allocated as follows at closing:

| Uses of Funds | Amount |
|---|---|
| Cash Payment to UTStarcom | $214,506,484 |
| Payments to Escrow | $24,291,840 |
| Transaction Expenses | $2,766,536 |
| | |
| **Total Funds:** | **$241,564,860** |

Second Amended Complaint, ¶¶ 16-19.  As indicated above, DLJ contributed $49,500,000 in

mezzanine loans[11] of the total $79,200,000 of the Second Lien Debt to finance the leveraged

buyout.[12]

---

[9] ISOP and PineBridge are collectively defined as the "PineBridge Defendants" or "PineBridge" in the Second Amended Complaint and in previous versions of the Complaint. In its opposition to the Motion to Amend, ISOP took issue with Plaintiff's labeling of ISOP as a "PineBridge Defendant." *See* dkt item 111. For the purposes of this ruling, however, the Court will utilize Plaintiff's definition.

[10] The Investor Defendants' collective loans are hereinafter referred to as the Second Lien Loans, and the documents governing those Loans as the 2008 Second Lien Loan Documents.

[11] DLJ refers to themselves as "standard third-party mezzanine investors that loaned $50 million to PCD, and also purchased a $5 million minority equity stake in the company."  Motion, ¶ 1. Plaintiff alleges that "Although the Debtors diligently sought other mezzanine financing, the financing provided under the Second Lien Loan was the only mezzanine financing available to them." Second Amended Complaint, ¶ 39.

[12] Each DLJ entity made a separate term loan, with a maturity date of September 29, 2013, documented in a separate promissory note. The parties agreed to an interest rate of 12% for the Second Lien Loans and to a mandatory

The PineBridge Defendants subordinated their purported security interests to those of DLJ pursuant to a Second Lien Credit Agreement executed on July 1, 2008 (the "2008 Credit Agreement"), effectively creating a "Third Lien Debt," *Id.* at ¶ 39.

In connection with the 2008 transactions, Debtors entered into a series of additional agreements. Holdings entered into the Amended and Restated Limited Liability Company Agreement of Holdings (the "Holdings LLC Agreement"), which provides, among other things, that the PineBridge Defendants, had the right to appoint a majority of the Board, and that an additional member of the Board could be chosen by those appointees. *Id.* at ¶ 26. Holdings also executed the Amended and Restated Limited Liability Company Agreement of Personal Communications Devices, LLC, (the "PCD LLC Agreement" and, together with the Holdings LLC Agreement, the "LLC Agreements"), which provides that "[t]he [Investor Defendants] shall not have any liability for the debts, obligations or liabilities of the LLC, except to the extent required under the Act. The [Investor Defendants] shall not have any liability to restore any negative balance in the [Investor Defendant's] capital account." *Id.* at ¶ 28. (modifications in original). Debtors entered into two additional agreements with the PineBridge Defendants according them rights to manage and advise the Debtors, which rights were independent of and in addition to the Board control provided to the PineBridge Defendants under the LLC Agreements. *Id.* at ¶ 31. First, Debtors entered into an Advisory Agreement with an affiliate of the PineBridge Defendants, under which Debtors agreed to pay to a PineBridge Advisor (a) an initial advisor fee in cash equal to $2,000,000, payable on demand, and (b) an annual advisor fee of $750,000. *Id.* at ¶¶ 32-33. Second, Debtors and the PineBridge Defendants executed a letter

---

prepayment provision, under which 60% of the Debtors' excess cash flow would be applied to the indebtedness under the Second Lien Debt. Second Amended Complaint ¶ 36, Exhibit F ¶¶ 1.01, 2.11, 2.13; Motion, ¶¶ 22-23.

agreement dated July 1, 2008, pursuant to which Debtors granted to the PineBridge Defendants additional management and Board oversight rights.  *Id.* at ¶ 34.

Plaintiff alleges that these agreements were executed for the exclusive benefit of the Investor Defendants and the Director Defendants, were not negotiated at arm's-length, and that because Holdings is the only member of PCD and is a non-operating entity, in reality the Director Defendants controlled the actions and made decisions on behalf of Debtors.  *Id.* at ¶¶ 27, 29, 30.

Although the Investor Defendants did not invest any cash or extend any additional credit to the Debtors after the initial 2008 transactions, Debtors made several equity distributions and loan prepayments to the Investor Defendants between 2009 and 2012.  *Id.* at ¶ 40.  These withdrawals contributed to the Debtors ultimately being insufficiently capitalized and having nearly no access to liquidity.  According to Debtors' unaudited financial statements for the year ending December 31, 2012, (a) the Debtors' owners' equity was $(32,015,000), and (b) PCD's cash balance had declined from $16,543,000 at the end of 2011 to $1,167,000 at the end of 2012.  By the end of 2012, each of the Investor Defendants' capital accounts had a negative balance.  *Id.* at ¶ 45.

According to Debtors' schedules, as of the Petition Date, PCD's cash balance remained at less than $1.2 million.  *Id.* at ¶ 41.

In the years 2009, 2011 and 2012, the Investor Defendants withdrew over $24 million from the Debtors, which were characterized as tax distributions, with a majority (over $20 million) of such withdrawals occurring in 2011 (collectively, the "Distributions").  At the time the Distributions were made, Debtors had outstanding accounts payable of $133 million to $515 million.  *Id.* at ¶ 42.

DLJ received Distributions in the aggregate amount of $3,517,703 during these three years. *Id.* at ¶ 44.

In addition to periodic principal and interest payments, pursuant to Section 2.11(b) of the 2008 Credit Agreement, PCD was required to make prepayments of principal equal to 60% (later increased to 75%) of PCD's excess net cash flow. *Id.* at ¶ 48. PCD made prepayments of excess net cash flow in the aggregate amount of $17,800,000 in the years 2010 ($9,800,000) and 2011 ($8,000,000). *Id.* at ¶¶ 39, 49.

Taken together, the Distributions and the mandatory prepayments to the Investor Defendants aggregate to $42.2 million over and above periodic interest payments due under the Second Lien Loans. *Id.* at ¶ 50.

The PineBridge Defendants, who viewed the Debtors as a short term investment with a goal of exiting by the end of 2011, and the Director Defendants used their positions of authority to seize operating control of the Debtors and exclude additional investments by outsiders, and forced PCD's founder and longtime CEO Philip Christopher out, without a transition plan in place. *Id.* at ¶ 52. On July 26, 2012, PineBridge informed Christopher that it had hired George Appling as his replacement. The PineBridge Defendants and the Director Defendants had no transition plan, and refused Christopher's offers to create one that would allow the new CEO to be brought up to speed and build relationships with the Debtors' bankers and business partners. *Id.* at ¶ 72. In order to ensure their interests were satisfied, the PineBridge Defendants even agreed to "backstop" a portion of the compensation offered to Appling in order to ensure his loyalty to the PineBridge Defendants rather than the Debtors. *Id.* at ¶ 92. These actions contributed significantly to a hemorrhage of key management and other employees, the

disruption of the Debtors' relationships with their bankers, customers and business partners, and ultimately the collapse of the Debtors' business. *Id.* at ¶ 53.

This Court notes that Plaintiff does not allege any additional facts as a basis for asserting wrongdoing by DLJ, and that while the Second Amended Complaint focuses on the capital structure of the initial 2008 leveraged buyout and distributions taken out in subsequent years, Plaintiff has not asserted a single fraudulent transfer claim against DLJ.

***Plaintiff has not plausibly plead a claim for recharacterization of DLJ's debt as equity (second cause of action)***

As noted above, Plaintiff acknowledges that the PineBridge Defendants contractually subordinated their lien and security interests to those of DLJ, such that DLJ in effect held a second lien position and PineBridge in effect held the third. Plaintiff asserts that the $49,500,000 loaned by DLJ on a second lien basis should be recharacterized as an equity infusion, and treated the same as the $5,000,000 invested by DLJ as equity.

Plaintiff and DLJ basically agree on the test for determining whether debt should be recharacterized as equity, with both relying on *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. 2001) ("Autostyle") and *Adelphia Communs. Corp. v. Bank of Am., N.A. (In re Adelphia Communications Corp.)*, 365 B.R. 24, 74-75 (Bankr. S.D.N.Y 2007) *aff'd in part sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *on reconsideration*, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008) ("[T]he paradigmatic situation for recharacterization [is] where the same individuals or entities (or affiliates of such) control both the transferor and the transferee").

Courts which conduct a recharacterization analysis to determine whether a loan is actually disguised equity often consider the following eleven criteria, referred to as the *Autostyle* test:

(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; [and] (11) the presence or absence of a sinking fund to provide repayments.

269 F.3d at 749-50; *see In re BH S&B Holdings LLC,* 420 B.R. 112, 157-58 (Bankr. S.D.N.Y. 2009) (citing *Autostyle*, 269 F.3d at 749-50); *see also In re Lothian Oil Inc.*, 650 F.3d 539, 543-44 (5th Cir. 2011) (noting that the district court had reversed the bankruptcy court's recharacterization on the basis of its legal conclusion that recharacterization applies only to claims filed by corporate insiders, and declining to "impose such a *per se* rule. Unless state law makes insider status relevant to characterizing equity versus debt, that status is irrelevant in federal bankruptcy proceedings"); *In re SubMicron Systems Corp.*, 432 F.3d 448, 455-56 *fn omitted* (3rd Cir 2006) ("In defining the recharacterization inquiry, courts have adopted a variety of multi-factor tests borrowed from non-bankruptcy case law. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.").

The uncontroverted facts before the Court, taking Plaintiff's allegations in the light most favorable to and drawing all inferences in favor of Plaintiff, result in the *Autostyle* factors being overwhelmingly in favor of DLJ: (1) the instruments evidencing the indebtedness are all denominated as debt instruments; (2) the DLJ loan documents had a fixed maturity date

(September 29, 2013), with a set schedule of payments due prior to maturity; (3) the DLJ loan documents had a fixed rate of interest and interest payments; (4) the ultimate source of repayment for DLJ was its second lien collateral, and Plaintiff plead that "DLJ was the beneficiary of 60% of [PCD's] excess cash flow" (Response p. 18, ¶ 48); (5) Plaintiff has not plead with any specificity that the purchase transaction resulted in PCD having inadequate capitalization[13]; (6) as for the identity of interest between the creditor and the stockholder, it is evident that DLJ did not make loans in proportion to their equity investments; DLJ received 10% of the equity for a $5,000,000 investment but provided 62% of the second lien financing, whereas the PineBridge Defendants provided 38% of the second lien financing and received 71.44% of the equity in consideration of their $34,000,000 equity investment; (7) the security for DLJ's advances consisted of perfected second liens in substantially all of PCD's assets; (8) the corporation's ability to obtain financing from outside lending institutions is exhibited by Debtors obtaining approximately $114,000,000 from an unaffiliated first lien loan group; (9) there is no indication that any of DLJ's loans were subordinated to the claims of any creditors other than the approximately $114,000,000 from an unaffiliated first lien loan group; (10) DLJ's loan were predominately used to acquire the UTStarcom' assets through a leveraged buyout and not to purchase assets; and (11) there was no sinking fund to provide for repayments.

Thus, considering the *Autostyle* analysis in the aggregate, Plaintiff has not made out a plausible claim to recharacterize the DLJ $49,500,000 second lien loan.  In its papers and at the

---

[13] In Plaintiff's Response, in addressing PineBridge, Plaintiff states that "it does not allege that [PCD and Holdings] were undercapitalized as of the 2008 transaction" (Response p. 11, para. 28), and later states that it "reserves the right to further amend its [First] Amended Complaint, if appropriate, to address undercapitalization after it has had the benefit of discovery" (Response p. 18, ¶ 49).  Plaintiff had taken significant pre litigation discovery in the main bankruptcy case through several Rule 2004 examinations and document productions, and as of its live pleading, the Second Amended Complaint, it still does not plead that the 2008 leveraged buyout left PCD undercapitalized. *See* Case No. 13-74303, dkt items 170, 171.

Hearing, Plaintiff acknowledged DLJ's lack of control over Debtors and their actions.  For example, when asked by the Court how DLJ, as a minority interest holder, could modify the maturity date, payment schedule, or interest rate once the 2008 transactions were implemented, Plaintiff acknowledged that it was unable to demonstrate that DLJ controlled Debtors, but argued that DLJ passively acquiesced in PineBridge's control.  The Court is not persuaded by Plaintiff's argument that a minority shareholder who lacks the ability to control the course of a debtor's actions is in any event, without evidence or even allegations of bad acts, liable for the actions of the controlling interest owners.

Finally, while Plaintiff does complain about two restructurings of the PineBridge and DLJ Second Lien Loans in 2012, it does not seek recharacterization of the DLJ loans based on these amendments.[14]  Therefore, the recharacterization claim should be dismissed.

### Plaintiff has not plausibly plead a claim for setoff (fourth cause of action) or unjust enrichment (fifth cause of action)

Plaintiff's setoff and unjust enrichment claims against DLJ both arise from DLJ's equity position, and not their secured lien status.  Plaintiff asserts that in the three years prior to the Petition Date, Debtors made tax distributions in the aggregate amount of $24,412,958, of which DLJ received a total of $3,517,703.  Second Amended Complaint, p. 16, ¶¶ 42-44.  Plaintiff goes on to assert that these tax distributions were made pursuant to Section 3.4 of the Holdings LLC Agreement, to which DLJ was a party, which provides:

---

[14]  Plaintiff alleges that PCD and Holdings amended the 2008 Second Lien Loan documents in May 2012 and again in December 2012. Although the Investor Defendants did not extend any additional credit, Plaintiff alleges, PCD and Holdings paid a fee in excess of $450,000 in connection with the amendments. The May 2012 Amendments extended the maturity date of the Second Lien Loans to November 14, 2017, and increased the mandatory prepayment percentage from 60% to 75% of excess net cash flows. The December 2012 Amendments shortened the maturity date from November 14, 2017 to the earlier of September 30, 2014 or six months after the maturity of the First Lien Loans, increased the interest rate from 12.0% to 15.0%, and required the Debtors to embark on a restructuring process. Second Amended Complaint, p. 25, ¶¶ 82–84.

3.4 <u>Tax Distributions</u>. The LLC shall distribute to each Member in cash, prior to the end of each fiscal quarter or at least ten (10) Business Days before the date on which any quarterly estimated tax payments are due, an amount (a "<u>Tax Distribution</u>") equal to (i) the product of (A) the highest combined federal and state tax rate (expressed as a percentage) applicable to any Member assuming such Member was subject to the highest statutory marginal tax rates in the jurisdiction in which it is domiciled or resides (or if higher, in which the LLC does business) and (B) the aggregate federal taxable income expected to be allocated to such Member (including any guaranteed payments described in Section 4.1(c)) for such fiscal quarter <u>minus</u> (ii) the aggregate amount of all distributions actually made to such Member provided for in Section 3.1 [regarding discretionary distributions] or Section 3.2 [regarding the priority of distributions] with respect to such fiscal quarter or period. *Tax Distributions made pursuant to this Section 3.4 shall be treated as interest free advances on each Member's distributions and shall reduce such Member's rights to future distributions* (other than Tax Distributions).

Holdings LLC Agreement, Section 3.4 (emphasis in original).

Plaintiff does not claim that the Holdings LLC Agreement was breached; rather, Plaintiff claims that the "stated purpose" of the Tax Distributions "was to compensate the Defendants for tax liability they incurred or would incur as a result of PCD's ordinary business income in the year 2012 and prior." Plaintiff also asserts that because (i) Debtors are each limited liability companies that incurred substantial net operating losses in 2013 that are allocable to the Debtors' members on a *pro rata* basis, and (ii) that "pursuant to 26 U.S.C. § 172(b)(1), net operating losses may be retroactively applied against the members' past two years of tax returns to generate significant tax refunds," the estate is therefore entitled to recoup the benefits equity owners, such as DLJ, would receive as a result of restating Debtors' prior year's net operating income based on net operating losses from 2013. Plaintiff further asserts an entitlement to setoff such that if, as and when DLJ is paid by virtue of the post-petition sale of Debtors' assets, the estate should recover "the amount of Distributions received in excess of their actual tax liability, as determined by the amount of any tax refund obtained by the Defendants or the Defendants' investors through application of the Debtors' 2013 net operating losses."

Finally, Plaintiff alleges that "[u]nder the circumstances, it would be unjust to allow [DLJ] to retain (a) the Distributions to the extent they exceed [DLJ's] tax liability, and (b) the amount of any tax refund they would otherwise be entitled to receive based on application of the Debtors' 2013 net operating losses."  Second Amended Complaint, pp. 33-34, ¶¶ 129-147.  This Court disagrees with each of Plaintiff's arguments.

First, Plaintiff does not plead that any contract was breached by a miscalculation of the Tax Distributions, and conceded at the Hearing that it is not claiming that DLJ received more Tax Distributions than it was contractually entitled to.  [dkt item 121, Hr. Tr. 32:11-23]  Rather, the crux of Plaintiff's setoff and unjust enrichment claims are: (i) an assertion that DLJ received more Tax Distributions than were necessary to pay their actual tax liabilities, and that Debtors could only make distributions to cover actual negative tax attributes of its owners, i.e. actual passed though gains attributed to them as a result of being interest owners in a limited liability company calculated based on their actual tax effect; and (ii) that somehow the Tax Distributions should not be calculated quarter to quarter or year to year, but can be aggregated for more than one tax reporting year.  However, none of these arguments are supported by the written agreements with Debtors, and are expressly countermanded by Section 3.4 which states: (i) as to the how much to distribute, the Tax Distribution must be based on the "highest combined federal and state tax rate (expressed as a percentage) applicable to any Member assuming such Member was subject to the highest statutory marginal tax rates in the jurisdiction in which it is domiciled or resides (or if higher, in which the LLC does business)….", and (ii) as to the when, such distribution are due "prior to the end of each fiscal quarter or at least ten (10) Business Days before the date on which any quarterly estimated tax payments are due.…"  Moreover, Section 3.4 provides that Tax Distributions are to be treated as interest free advances on each member's

distributions and will reduce such member's rights to future distributions other than Tax Distributions.

There is nothing plead by Plaintiff or contained in any agreement that allows Plaintiff to seek to recoup any Tax Distributions which exceed any member's actual tax liabilities, or to recoup prior year or prior quarter tax distributions based on a subsequent year or subsequent quarter's net operating loss.  Moreover, Plaintiff does not plead that Debtors failed to reduce DLJ's rights to future distributions based on prior Tax Distributions.

Thus, Plaintiff's unjust enrichment claims, which it asserts is governed by New York law, must fail.  A claim for unjust enrichment requires proof "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Kottler v. Deutsche Bank AG,* 607 F.Supp.2d 447, 467 (S.D.N.Y. 2009) (quoting *State Farm Mutual Automobile Insurance Company v. CPT Medical Service, P.C.*, 375 F.Supp.2d 141, 154 (E.D.N.Y. 2005)).  As a matter of law, a claim for unjust enrichment is "precluded by the existence of an express written agreement governing the subject matter at issue".  *Boccardi Capital Sys. Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.,* 355 F. App'x 516, 519 (2d Cir. 2009); *Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) ("[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653, 656 (N.Y. 1987)); *see also In re First Cent. Fin. Corp.*, 377 F.3d 209, 213 (2d Cir. 2004) ("[W]e conclude that this principle—that the existence of a written agreement precludes a finding of unjust enrichment—also applies to constructive trust claims...."); *Nemec v.*

*Shrader,* 2009 Del. Ch. LEXIS 67, at \*17 (Del Ch. Apr. 30, 2009) ("Delaware courts ... have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract.") *aff'd* 991 A.2d 1120, 1130 (Del. 2010).

Plaintiff acknowledges that it may only seek unjust enrichment recovery if the dispute at issue is not covered by the contract at issue. Section 3.4 of the Holdings LLC Agreement, to which DLJ was a party, expressly and unambiguously provides for the timing, calculation and payment of the Tax Distributions. Plaintiff essentially argues that the fact that the contract does not support its claims for recovery of Tax Distributions is in and of itself a basis for its unjust enrichment claims. This is simply incorrect and unsupported by the case law cited by both sides.

Thus, this Court applies the contract as it was written, and finds no contractual provision which allows the recovery of any previously paid, properly calculated Tax Distributions, nor does it find that the payment or recovery of Tax Distributions is a matter not covered by the contract.

Further, and in the alternative, Plaintiff has not plausibly plead that Debtor did experience actual net operating losses for 2013. Since fiscal year 2013 closed for Debtors and because a tax return could have been filed or at least tax attributes calculated well before the filing of the Second Amended Complaint in February 2015, or even when filed as a proposed Second Amended Complaint in September 2014, Plaintiff's unsupported legal theory is factually unsupported as well. *See Kenford v. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 502 N.Y.S.2d 131 (N.Y. 1986) (damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes).

Because this Court rejects the liability theories asserted by Plaintiff, it need not reach its claim of setoff, under which Plaintiff seeks to recover any amounts it is awarded as a result of various pre-petition transactions from DLJ's entitlement have their liens satisfied from the post-petition sale of Debtors' assets.[15]

### *Plaintiff has not plausibly plead a claim for breach of contract (sixth cause of action)*

Plaintiff alleges that DLJ has liability to Plaintiff under the LLC Agreements based on the status of their investor capital accounts; Plaintiff asserts this claim under Delaware law, the state in which Plaintiffs were incorporated.  DLJ does not dispute that their accounts had a negative balance at the Petition Date, but argue that as a matter of law they were not contractually obligated to restore their negative capital accounts to zero or to a positive number.

Plaintiff does not plead or refer to a contract provision that specifically obligates DLJ to restore their capital accounts; rather, Plaintiff references Section 8 of the PCD LLC Agreement, which provides in that "[t]he Member shall not have any liability for the debts, obligations or liabilities of the LLC, except to the extent required under [applicable corporate law].  The Member shall not have any liability to restore any negative balance in the Member's capital account."  Plaintiff goes on, however, to assert that the Holdings LLC Agreement, executed on the same day as the PCD LLC Agreement, "does not contain this exemption from liability for

---

[15] The ability of Plaintiff to setoff as it seeks to do, even if it stated a viable theory for damages, is dubious. *See in re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 107-108 (S.D.N.Y. 2010) (setoff of post-petition claims of the Bankruptcy estate against prepetition secured claims is impermissible as a matter of law); *In re Lehman Bros., Inc.*, 458 B.R. 134, 139-140 (Bankr. S.D.N.Y. 2011); *Scherling v. Hellman Elec. Corp. (In re Westchester Structures)*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995) ("under New York law, to offset debts, they must be mutual" citing *Beecher v. Vogt Mfg. Co.*, 227 N.Y. 468, 473, 125 N.E.831 (1920)); *see also In re Women First Healthcare, Inc.*, 345 B.R. 131, 135 (Bankr. D. Del 2006) ("under either [§ 553 or § 558] there must be mutuality between the parties, that is the estate must seek to set off a debt it owed to the creditor against a debt the creditor owes to the estate."). The Court recognizes that Plaintiff also sought to setoff "any amounts due and owing to the Debtors' estates pursuant to the other causes of action" against the Investor Defendants. Because this Decision and Order dismisses all of the DLJ Claims, excluding Plaintiff's non-monetary claim for a declaratory judgment that certain commercial tort claims are unencumbered, there is no recovery to Plaintiff to be setoff.

negative capital account balances," and that, therefore DLJ as an investor with a negative capital account balance in Holdings is required under the laws of the State of Delaware to restore its account to zero.  Second Amended Complaint, pp. 37-38, ¶¶ 149-152.  This claim is not plausible.

First, as Plaintiff concedes, DLJ was not a party to the PCD LLC Agreement.  In paragraph 29 of the Second Amended Complaint, Plaintiff states: "[t]he PCD LLC Agreement was executed by the PineBridge Defendants, through Stearns, as the manager of Holdings. There are no other parties to the PCD LLC Agreement."  As such, DLJ is not bound to the terms or conditions of the PCD LLC Agreement as DLJ is not a party to it.  *See Am. Legacy Found. v. Lorillard Tobacco Co.,* 831 A.2d 335, 344, n.42 (Del Ch. 2003) ("a fundamental principal of contract law provides that only parties to a contract are bound by that contract"); *see also Gordon v. Curtis,* 68 A.D.3d 549, 550, 893 N.Y.S.2d 6 (1st Dep't 2009) (a breach of contract cause of action must identify the express provision that defendants allegedly breached).

Plaintiff has not cited any persuasive authority for its proposition that the absence of one provision in a contract to which DLJ is not a party is relevant to the construction or interpretation to be given to a contract to which DLJ is party.  Although Plaintiff does cite *Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218, at \*9 (Del. Super. May 30, 2008) for the notion that the two LLC agreements should be construed together as part of a single transaction[16], even if the

---

[16] *Segovia* states that not only must contracts be construed as whole documents, but multiple documents evidencing the same transaction must be construed together. "When the parties have executed separate documents on the same day covering the same period of time and intend these documents to operate as two halves of the same business transaction, then the Court must treat them as one contract. This approach remains true even if the documents are "executed by a single party or by two or more parties, and even when some of the documents are executed by parties who have no part in executing the others." *Segovia*, 2008 WL 2251218 at \*9 (internal quotation marks and citations omitted).

two LLC agreements are construed together, that construction does not breathe life into Plaintiff's breach of contract claim against DLJ.

There are multiple provisions of the Holdings LLC Agreement which make clear that DLJ has no obligation to restore its capital accounts to a zero or to a positive balance.  The Holdings LLC Agreement provides in Section 2.5 that "except as set forth in Sections 2.4 ..., Section 2.6 or Section 3.3, no Member shall be required to contribute or lend funds to the LLC." Plaintiff does not allege that Sections 2.4, 2.6 or 3.3 are triggered.  Further, the Holdings LLC Agreement further provides in Section 2.5 that "[n]o Member shall be liable for any debts or losses of capital or profits of the LLC."[17]  Plaintiff has not cited a single contractual provision in either LLC agreement under which DLJ would be required it restore its negative capital accounts to zero or a positive amount.

Thus, Plaintiff has not plausibly plead a breach of contract claim.

***Plaintiff has not plausibly plead a claim disallowance of DLJ's claims (eighth cause of action)***

Plaintiff has not plausibly plead a claim for disallowance of DLJ's claims. This cause of action is brought as a derivative claim; that is, Plaintiff relies on other express causes of action which seek monetary relief or recharacterization of debt as equity to obtain an order of disallowance of DLJ's claim.  Plaintiff states:

> For the reasons set forth herein, pursuant to Federal Rule of Bankruptcy Procedure 3007(b), The Trust hereby objects to any and all claims asserted or filed by or scheduled on behalf of each of the Investor Defendants against the Debtors' estates….  Additionally, to the extent property is recoverable from any of the Investor Defendants pursuant to 11 U.S.C. §§ 542, 544, 547, 548, 549 and 550, the Investor Defendants have not paid such amounts for which they are liable…. Accordingly, pursuant to 11 U.S.C. § 502(d), any and all claims asserted

---

[17] DLJ also relies on a "side letter" agreement dated as of July 1, 2008, which it attached to its supporting documents.  However, that side letter is not signed by Holdings and, as such, is not considered by the Court.

or filed by or scheduled on behalf of each of the Investor Defendants against the Debtors' estates must be disallowed.

Second Amended Complaint, p. 39, ¶¶ 160-162.

Because this Court has determined that DLJ has no liability to Plaintiff, there is no basis to convert DLJ's lien claims into equity interests, and because the disallowance claim is purely derivative of the other express claims for damages, this Court will not disallow any portion of the DLJ claims.[18]

***DLJ has not sought dismissal of Plaintiff's claim for a declaratory judgment as to whether DLJ has a lien on commercial tort claims (seventh cause of action)***

DLJ has not sought dismissal of Plaintiff's seventh cause of action, for a declaratory judgment as to whether DLJ has a lien on commercial tort claims. Thus, while this Court will not disallow any portion of DLJ's proofs of claim, it must later determine whether such allowed claims include a lien on any of either Debtor's commercial tort claims.

### Conclusion

This Court finds and concludes that the DLJ Motion should be granted.[19]  As DLJ has not sought dismissal of Plaintiff's claim that DLJ's liens do not encumber Debtors' commercial tort claims, that cause of action will remain pending as against DLJ. For the foregoing reasons, it is hereby

---

[18] This Court therefore need not reach DLJ's argument that Plaintiff's claims' objections are barred under the Final DIP Order, which Order includes stipulations to the validity of DLJ's claims under the 2008 Credit Agreement and the other Second Lien Loan Documents.

[19] This Court is not granting Plaintiff leave to amend. This adversary proceeding was commenced on October 28, 2013. On September 11, 2014, this Court issued a scheduling order in which it, *inter alia,* set a deadline for any further motions seeking leave to amend to be filed by October 9, 2014, which is when Plaintiff filed its motion for leave to file its Second Amended Complaint. Thus, any further amended complaints would be barred as untimely. *See* FED. R. CIV. P. 16(b)(3)(A) (scheduling order must limit the time to amend pleadings), as incorporated by FED. R. BANKR. P. 7016.

**ORDERED**, that the Second, Fourth, Fifth, and Sixth and Eighth causes of action asserted in the Second Amended Complaint are dismissed as to DLJ; and it is further

**ORDERED**, that DLJ shall file a responsive pleading to the Seventh cause of action asserted in the Second Amended Complaint within **twenty one (21) days**.



**Dated: April 3, 2015**
**Central Islip, New York**

_____
**Alan S. Trust**
**United States Bankruptcy Judge**